Aaron P. Hisel, OSB #161265
*aaron@capitol.legal*
William W. Manlove, OSB #896107
*bill@capitol.legal*
Capitol Legal Services
901 Capitol St. NE
Salem, OR 97301
Telephone: (503) 480-7250
Fax: (503) 779-2716
Attorneys for Defendants Linn County, City of Albany, Albany Police Department, and Linn County Sheriff's Department

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

YOLANDA PRIDDY, personal representative for the ESTATE OF JULIUS HAMILTON, and RICKEY ALLEN HAMILTON,

Plaintiffs,

v.

LINN COUNTY, a political subdivision of the State of Oregon; CITY OF ALBANY; ALBANY POLICE DEPARTMENT; and LINN COUNTY SHERIFF'S DEPARTMENT,

Defendants.

Case No. 6:25-cv-00208-AP

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Oral Argument Requested**

## LR 7-1 CERTIFICATION

Counsel for Defendants Linn County, City of Albany, Albany Police Department, and Linn County Sheriff's Department conferred with Plaintiffs' counsel on Monday, July 13, 2026 by telephone and through subsequent emails. (Declaration of William W. Manlove ("Manlove Decl.") ¶ 2).

Through conferral, the parties were able to resolve the following matters through agreement of the parties:

Plaintiffs concede that the Estate of Julius Hamilton is the only proper plaintiff, which results in Rickey Hamilton being dismissed as an additional Plaintiff and any theories of damages alleged on behalf of Julius Hamilton, Rickey Hamilton, Yolanda Priddy, and Crystal Priddy in their individual capacities should also be dismissed.

Otherwise, Plaintiffs are unwilling to voluntarily dismiss their claims against the defendants. *Id.* The Court's assistance is, therefore, required to resolve the remaining disputes covered by this motion.

## **MOTION**

Defendants move the Court under Fed. R. Civ. P. 56(c) for Summary Judgment against Plaintiffs' Complaint (ECF 1), on the following grounds:

(1) The separately stated defendants Albany Police Department and the Linn County Sheriff's Office are entitled to summary judgment because they are not proper parties to Plaintiffs' action, either under the Americans with Disabilities Act ("ADA") or 42 U.S.C. § 1983. *Updike v. Clackamas County*, Case No. 3:15-cv-00723-SI, 2015 WL 7722410, at *4, (D. Or., November 30, 2015). Linn County and the City of Albany are the only proper defendants.

(2) Defendants Linn County and the City of Albany are entitled to summary judgment on Plaintiffs' First Claim for Relief that defendants violated Title II of the ADA, 42 U.S.C. § 12131 because Mr. Hamilton did not have a qualifying disability under the ADA, the ADA does not mandate independent mental health responders when an individual armed with a firearm is involved, and defendants' response was not a violation of the ADA, particularly given the exigencies existing. *Sheehan v. City & County of San Francisco,* 743 F.3d 1211, 1231-33 (9th Cir. 2014), *rev'd in part on other grounds*, 575 U.S. 600 (2015); *Mayfield v. City of Mesa*, 131 F.4th

1100, 1111 (9th Cir. 2025); *Bresaz v. County of Santa Clara*, 136 F. Supp. 3d. 1125, 1131-33, 1135-37 (N.D. Cal. 2015); *Klamut v. California Highway Patrol*, Case No. 15-cv-02132-MEJ, 2015 WL 9024479 (N.D. Cal., December 16, 2015).

(3) Defendants Linn County and the City of Albany are entitled to summary judgment on Plaintiffs' Second Claim for Relief that defendants violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 for the same reasons presented in defendants' motion no. 2 above.

(4) Defendants Linn County and the City of Albany are entitled to summary judgment on Plaintiffs' *Monell*[1] theory because Plaintiffs suffered no deprivation of any underlying federally protected right, and defendants have not been deliberately indifferent in training their employees to respond to persons suffering mental, emotional or behavioral health issues. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153-54 (9th Cir. 2021).

(5) Defendants Linn County and the City of Albany are entitled to summary judgment for any claim asserted by Rickey Allen Hamilton.[2]

(6) Defendants Linn County and the City of Albany are entitled to summary judgment for any claim or damages theory asserted on behalf of Julius Hamilton, Rickey Hamilton, Crystal Priddy, or Yolanda Priddy in their individual capacities.[3]

(7) Defendants Linn County and the City of Albany are entitled to summary judgment for any claim of injunctive relief or declaratory relief. *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388 (2006).

In support of this Motion, Defendants rely upon:

---

[1] *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).
[2] Plaintiffs have agreed to dismiss Rickey Allen Hamilton as a party. (See Manlove Decl., ¶ 14).
[3] Plaintiffs have agreed to dismiss any claims asserted by Julius Hamilton, Crystal Priddy, and Yolanda Priddy in their individual capacities. (Manlove Decl., ¶ 14).

(a) The pleadings and evidence on file with the Court;

(b) The Declarations of Darrin Breshears, Lashaun Emile, Kenneth Fandrem, Marcia Harnden, Jordan Kirksey, Chris Johnson, Koddie Lowery, William W. Manlove, Nathan McIntyre, Micah Smith, Eric Tress and David Vaughn, and the exhibits attached thereto; and

(c) The Memorandum of Law below.

## TABLE OF CONTENTS


MOTION.....2

TABLE OF AUTHORITIES.....7

MEMORANDUM OF LAW.....11

I. Introduction and Overview of Claims.....11

II. Factual Background.....12

A. Ms. Rosales' Call for Service on February 8, 2023, Regarding Mr. Hamilton.....12

B. The Initial Response at Freeway Lakes Park.....14

C. Mr. Hamilton Points a Pistol at Law Enforcement Officers; Officer Tress and Officer Fandrem Respond With Deadly Force.....18

D. Linn County and City of Albany's 911 Dispatch System.....20

E. Mr. Hamilton Was Never Diagnosed or Treated for Any Sort of Mental Health Disability.....22

III. Summary Judgment Standard.....24

IV. Argument.....25

A. The Linn County Sheriff's Office and the Albany Police Department Are Not Proper Parties.....25

B. Statutory Overview.....25

1. Elements of a Title II American with Disabilities Act ("ADA") Claim and Section 504 Rehabilitation Act ("RA") Claim.....25

2. Theories of Liability Under the ADA and Section 504.....27

3. Money Damages Requires the *Mens Rea* of Intentional Discrimination.....28

4. Limits to ADA Title II and Section 504 Claims.....29

C. Mr. Hamilton Was Not a Qualified Person Under the ADA With a Covered Disability. A Single Episode of Suicidal Ideation is Not a Qualifying Disability.....31

D. Plaintiffs Seek an Unreasonable Modification of Defendants' Emergency Response Services. Alternatively, Plaintiffs Seek a Fundamental Alteration of Defendants' Emergency Response Services.....36

E. Plaintiffs Are Not Entitled to Any Damages.....40

F. Because Julius Hamilton Posed an Immediate Threat When He Pointed the Handgun at Defendants' Officers, He Was Not Entitled to Any Accommodation Under the ADA ....41

G. Mr. Hamilton's Alleged Disability Did Not Cause the Shooting ....41

H. There is no *Monell* Violation for Any Alleged Failure to Train, Supervise or Discipline ....42

1. Plaintiffs Have Failed to Prove a Violation of the 4th or 14th Amendments or of the ADA or RA ....42

2. Even if an Underlying Violation Could be Identified Plaintiffs Cannot Prove the Defendants Failed to Train Their Employees ....43

I. Rickey Allen Hamilton ....47

J. Julius Hamilton, Crystal Priddy and Yolanda Priddy Are Not Parties to Plaintiffs' Action. As such, They Are Not Entitled to Any Form of Damages. ....47

K. Plaintiffs Have No Claim for Injunctive Relief or Declaratory Relief ....48

CONCLUSION ....48

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................ 24

*Barden v. City of Sacramento,*
292 F.3d 1073 (9th Cir. 2002) ........................................ 26

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................ 31

*Benavidez v. Cnty. of San Diego,*
993 F.3d 1134 (9th Cir. 2021) ........................................ 3, 43

*Bresaz v. County of Santa Clara,*
136 F. Supp. 1125 (N.D. Cal. 2015) ........................................ 3, 26, 32, 33, 34

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................ 24

*City of Canton, Ohio v. Harris,*
489 U.S. 378 (1989) ........................................ 43, 44

*City of Los Angeles v. Heller,*
475 U.S. 796 (1986) ........................................ 3, 43

*Connick v. Thompson,*
563 U.S. 51 (2011) ........................................ 43, 44

*Crowder v. Kitagawa,*
81 F.3d 1480 (9th Cir. 1996) ........................................ 28

*Davis v. Shah,*
821 F.3d 231 (2nd Cir. 2016) ........................................ 27

*Duvall v. County of Kitsap*,
260 F.3d 1124 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001) .. 25, 27, 28, 29

*Eagon v. Cabell County Emergency Medical Services,*
766 F. Supp. 3d 623 (S.D. West Virgina 2025) ........................................ 35

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006) ........................................ 3, 48

*Estate of Strickland v. Nevada County,*
69 F.4th 614 (9th Cir. 2023) ........................................ 42

*Ferguson v. City of Phoenix*,
157 F.3d 668 (9th Cir. 1998) .......... 28

*Foulke v. Weller,*
No. 22-13942, 2024 WL 2761778, at *9 (11th Cir. 2024) .......... 35

*George v. Morris,*
736 F.3d 829 (9th Cir. 2013) .......... 42

*Gillette v. Oregon,*
3:20-CV-00513-IM, 2022 WL 2819057, at *8 (D. Or. July 19, 2022) .......... 27

*Goodwin v. Marin Cnty. Transit Dist.,*
675 F. Supp. 3d 1016 (N.D. Cal. 2022) .......... 28

*Graham v. Conner,*
490 U.S. 386 (1989) .......... 42

*K.M. ex. rel. Bright v. Tustin Unified Sch. Dist*.,
725 F.3d 1088 (9th Cir. 2013) .......... 27

*King v. Hendricks County Commissioners,*
954 F.3d 981 (7th Cir. 2020) .......... 41

*Klamut v. California Highway Patrol*,
Case No. 15-cv-02132-MEJ, 2015 WL 9024479 (N.D. Cal. Dec. 16, 2015) .......... 3, 26, 31

*Lambdin v. Marriott Resorts Hosp. Corp*.,
2015 WL 263569, at *2 (D. Haw. Jan. 21, 2015) .......... 31

*Lane v. Kitzhaber,*
841 F. Supp. 2d 1199 (D. Or. 2012) .......... 30

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001) .......... 26

*Long v. City and County of Honolulu,*
511 F.3d 901 (9th Cir. 2017) .......... 42

*Longariello v. Gompers Rehab. Ctr*.,
2010 WL 94113, at *3 (D. Ariz. Jan 5, 2010) .......... 31

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*.,
475 U.S. 574 (1986). .......... 24

*Matthews v. NCAA*,
179 F. Supp. 2d 1209 (E.D. Wash. 2001) .......... 29

*Mayfield v. City of Mesa,*
131 F.4th 1100 (9th Cir. 2025) ........................................................................................ 2, 39

*Mehta v. City of Sunnyvale,*
721 F. Supp. 3d 1041 (N.D. Calif. 2024)............................................................................ 41

*Monell v. Dept. Of Soc. Servs.,*
436 U.S. 658 (1978)........................................................................................ 3, 11,42, 43, 47

*Murray v. Mayo Clinic,*
934 F.3d 1101 (9th Cir. 2019) ............................................................................................ 41

*O'Doan v. Sanford*,
991 F.3d 1027, 1045 n. 3 (9th Cir. 2021) .................................................................... 28, 41

*Ogan v. Newport Café,*
No. 6:23-00452-AA, 2023 WL 7622098, at *3 (D. Or. Nov. 14, 2023) ............................... 35

*Olmstead v. L.C. ex rel. Zimring,*
527 U.S. 581 n. 14 (1999).................................................................................................. 30

*Payan v. Los Angeles Community College District*.,
11 F.4th 729 (9th Cir. 2021) ......................................................................................... 25, 27

*Puente v. City of Phoenix,*
123 F.4th 1035 (9th Cir. 2024) .......................................................................................... 43

*Sabbe v. Washington Cnty. Bd. of Commissioners,*
84 F.4th 807 (9th Cir. 2023) .............................................................................................. 42

*Scott v. Henrich,*
39 F.3d 912 (9th Cir. 1994) ............................................................................................... 43

*Sheehan v. City and Cnty. of San Francisco,*
743 F.3d 1211 (9th Cir. 2014), *rev'd in part on other grounds,* 575 U.S. 600 (2015)..2, 26, 39

*Sheehan v. City and Cnty. of San Francisco*,
793 F.3d 1009 (Mem) (9th Cir. 2015) ................................................................................ 26

*Simmons v. Navajo County, Arizona*,
609 F.3d 1011 (9th Cir. 2010) ............................................................................................ 30

*Taylor v. City & Cnty. Of Honolulu,*
No. CV 22-00013 HG-KJM, 2023 WL 2753162, at *14 (D. Haw. Mar. 31, 2023).............. 44

*Taylor v. List*,
880 F.2d 1040 (9th Cir. 1989) ............................................................................................ 24

*TW Elec. Service Inc. v. Pacific Elec. Contractors Ass'n.*,
809 F.2d 626 (9th Cir. 1987) .......... 24

*Updike v. Clackamas County,*
Case No. 3:15-cv-00723-SI, 2015 WL 7722410, at *4 (D. Or. Nov. 30, 2015).......... 2, 25

*Updike v. Multnomah County*,
870 F.3d 939 (9th Cir. 2017) .......... 28, 40

*Vos v. City of Newport Beach,*
892 F.3d 1024 (9th Cir. 2018) .......... 27

*Wallace v. Washington Cnty. Jail*,
3:18-CV-1975-SI, 2023 WL 4744740, at *7 (D. Or. July 25, 2023).......... 28

*Waller v. City of Danville, Virginia,*
515 F. Supp. 2d 659 (W.D. Virginia, 2007) .......... 39

*Washington v. Cal. Dep't of Corr. & Rehab.*,
No. 19-cv-169-VAP (KK), 2019 WL 1206487, at *6 (C.D. Cal. Mar. 14, 2019), aff'd 2019 WL 3295644 (C.D. Cal. Apr. 22, 2019) .......... 30

*Where Do We Go Berkeley v. California Dept. of Transportation*,
32 F.4th 852 (9th Cir. 2022) .......... 27, 39

**Statutes**

29 U.S.C. § 794.......... 3, 27
42 U.S.C. § 1983.......... 2, 12, 26, 43, 44
42 U.S.C. § 12102..........32, 34, 35, 36
42 U.S.C. § 12131..........2, 12
42 U.S.C. § 12132..........26
42 U.S.C. § 12201(h) ..........35

**Rules**

28 C.F.R. § 35.104.......... 32
28 C.F.R. § 35.108.......... 32, 35
28 C.F.R. § 35.130(b)(7)(i).......... 27, 30
28 C.F.R. § 35.139.......... 42
29 C.F.R. § 1630.2(g)(iii) .......... 12, 24
Fed. R. Civ. P. 17(b)(3).......... 26
Fed. R. Civ. P. 56(a) .......... 25, 26, 37, 41, 42, 44, 48
Fed. R. Civ. P. 56(c) .......... 2
Fed. R. Civ. P. 56(e) .......... 25
OAR 309-072-0150(1).......... 39

# MEMORANDUM OF LAW

## I. Introduction and Overview of Claims

On February 8, 2023, Julius Hamilton was shot and killed by a City of Albany police officer after Mr. Hamilton raised and pointed a pistol in the direction of officers. From this incident Plaintiff brings claims under the Americans with Disabilities Act, ("ADA") 42 U.S.C. § 12131, and Section 504 of the Rehabilitation Act ("RA"). (Complaint, ECF 1, ¶¶ 45-60, 61-69). Plaintiffs also attach a *Monell* claim under 42 U.S.C. § 1983 alleging that defendants failed to train, supervise or discipline its employees in violation of Mr. Hamilton's rights. (Complaint, ECF 1, ¶¶ 71-79). There are no attendant state law or excessive force claims. (ECF 1).

At paragraph 48 of the Complaint Plaintiffs allege that "Julius Hamilton met the applicable definition of disability provided under both Title II of the ADA and 29 C.F.R. § 1630.2(g)(iii)." (Complaint, ¶ 48). No specificity as to how Mr. Hamilton met these definitions is offered. (ECF 1). Defendants, therefore, propounded an interrogatory requesting Plaintiffs "[s]et forth in detail any qualifying disability that Julius Hamilton had at the time of his death as alleged in paragraph 48 of the Complaint." (Manlove Decl., ¶ 12, Ex. 10, p. 2). On behalf of the estate, Yolanda Priddy's complete response was: "Asthma." *Id*. Rickey Hamilton's complete response was "Asthma. Atopic Dermatitis. Extreme reactions to seafood." (Manlove Decl., ¶ 13, Ex. 11, p. 3).

There are no allegations related to Plaintiff being discriminated against or otherwise unable to engage in government services because of asthma, dermatitis or a seafood allergy. (ECF 1). Instead, the gravamen of the Complaint is focused on the presumption that Mr. Hamilton was entitled to something more or different under the circumstances because of his then-present mental health condition on February 8, 2023. (ECF 1).

//

//

## II. Factual Background

### A. Ms. Rosales' Call for Service on February 8, 2023, Regarding Mr. Hamilton

On February 8, 2023, at approximately 9:38 a.m., Felisha Rosales (an ex-partner to Julius Hamilton) called the Albany Police Department ("APD") nonemergency line requesting a welfare check on Julius Hamilton. (McIntrye Decl., ¶ 9, Ex. 1, p. 1). Ms. Rosales explained that she received a text message from Mr. Hamilton indicating Mr. Hamilton was emotionally distraught, believing he had failed as a father. (McIntyre Decl., ¶ 10, Ex. 1, p. 6). She explained to the 911 call taker that Mr. Hamilton might be going through a breakup with his current girlfriend. *Id.* Ms. Rosales told the 911 call taker that she believed Mr. Hamilton might be suicidal. *Id.* Ms. Rosales told the 911 call taker that she had spoken to Mr. Hamilton's mother, who told Ms. Rosales that she had also received a text message from Mr. Hamilton. *Id.* Ms. Rosales reported that she did not know if Mr. Hamilton had any weapons. *Id.*

The APD dispatcher attempted to call Mr. Hamilton's mother, Yolanda Priddy, but Ms. Priddy did not answer. *Id.*

At approximately 9:40 a.m., APD Officer Lashaun Emile noticed a call pending in his district involving a welfare check on a possible suicidal man residing at 1640 Crittenden Street SW in Albany, Oregon. (Emile Decl., ¶ 5). Officer Emile learned the man's name was Julius Hamilton, and dispatched to the Crittenden address. *Id.* While enroute, Officer Emile tried calling the phone number he had for Mr. Hamilton, but Mr. Hamilton did not pick up. *Id.* Shortly before arriving at 1640 Crittenden Street, Officer Emile was able to reach Angela Bolen (Mr. Hamilton's most recent partner) by phone. (Emile Decl., ¶ 6). Ms. Bolen told Officer Emile that Mr. Hamilton was at Freeway Lakes Park, at 6000 Three Lakes Road, which is in Linn County's jurisdiction. *Id.*

Officer Emile began driving towards Freeway Lakes Park. (Emile Decl., ¶ 6). While enroute and on the call with Ms. Bolen, Ms. Bolen told Officer Emile that Mr. Hamilton had a firearm and that he was pointing it at his head. (Emile Decl., ¶ 7). When Officer Emile heard this information, he advised over the radio that Linn County should start deputies to Freeway Lakes Park. *Id.* While enroute Officer Emile also learned from Ms. Bolen that she and two other family members were present at Freeway Lakes Park. *Id.* When Officer Emile learned this information, he advised over the radio that Linn County Sheriff's Office ("LCSO") should expedite their response, that three people were present with Mr. Hamilton and that his behavior was escalating. *Id.* While enroute Officer Emile also learned from Ms. Bolen that Mr. Hamilton sounded intoxicated and that he was arguing with several people. *Id.* Officer Emile communicated this information over the radio. *Id.*

While enroute Officer Emile again tried calling Mr. Hamilton by phone but he did not answer. *Id.*

APD Officer Eric Tress heard Officer Emile say over the radio that Officer Emile was trying to contact a suicidal male with a firearm at Freeway Lakes Park. (Tress Decl., ¶ 5). Officer Tress initially assumed the man was alone but soon learned from Officer Emile that other family members were also present. *Id.* Officer Tress called Officer Emile and confirmed that other people believed to be family members were present on scene. (Tress Decl., ¶ 6). Officer Emile told Officer Tress that the man was possibly intoxicated and intent on wanting to kill himself. *Id.* Officer Tress encouraged Officer Emile to keep an open line with the family members. *Id.*

Officer Tress began heading to Freeway Lakes Park and directed Officer Fandrem to do the same. (*Id.*, at ¶¶ 7-8). He told APD dispatch to have the incident at Freeway Lakes Park dedicated to the main dispatch channel and to move other radio traffic to backup channels. *Id.* When dispatch told Officer Tress that unit number 116 was available, Tress knew unit number 116

was Det. Koddie Lowery, who was a crisis negotiator. As a result, Officer Tress asked dispatch to dispatch Det. Lowery to the Freeway Lakes Park incident. (*Id.*, ¶ 8).

**B. The Initial Response at Freeway Lakes Park**

Linn County Deputy Darrin Breshears was scanning the APD radio channel and heard about an incident occurring at Freeway Lakes Park, which was in Linn County's jurisdiction. (Manlove Decl., ¶ 3, Ex. 1, Breshears Depo. Tr. p. 7:16-20). When dispatch put him on the call, Deputy Breshears learned more details, including that Mr. Hamilton had a firearm, and that members of Mr. Hamilton's family were also present. (Manlove Decl., Ex. 1, Breshears Depo. Tr. pp. 7:21- 8:23; Breshears Decl., ¶ 5).

Deputy Breshears was the first law enforcement officer to arrive at Freeway Lakes Park. (Manlove Decl., Ex. 1, Breshears Depo. Tr. p. 10:7-11; Breshears Decl., ¶ 6). Upon arrival, he saw a pickup truck and several women standing around the truck. (Manlove Decl., Ex. 1, Breshears Depo. Tr. p. 10:3-6). The pickup was parked about 20 yards away from where Deputy Breshears parked, with its engine idling. (Breshears Decl., ¶ 7). One of the women, later identified as Yolanda Priddy (Mr. Hamilton's mother) came up to Deputy Breshears saying "no, no, no." (Breshears Decl., ¶ 7). At some point, Yolanda Priddy told Deputy Breshears fthat he needed to not be at the location because Mr. Hamilton was going to kill himself if law enforcement was present. *Id.* Yolanda Priddy then walked back to the pickup truck where Mr. Hamilton remained armed with a handgun. (Manlove Decl., Ex. 1, Breshears Depo. Tr., p. 12:3-8; Breshears Decl., ¶ 7).

When Deputy Breshears got out of his patrol car, he could not immediately see that Mr. Hamilton was holding a gun. (Breshears Decl., ¶ 8; Manlove Decl., Ex. 1, Breshears Depo. Tr., pp. 11:7-9; 12:9-15). However, when Deputy Breshears walked around to the passenger side of his patrol car, he could see Mr. Hamilton through the pickup windshield and saw what looked like a gun in Mr. Hamilton's right hand. (Manlove Decl., Ex. 1, Breshears Depo. Tr., p. 12:16-24;

Breshears Decl., ¶ 8). Upon seeing that Mr. Hamilton was armed, Deputy Breshears unholstered his pistol, held it down by his side in a low-ready position, and yelled towards the women to move away from the truck. (Manlove Decl., Ex.1, Breshears Depo. Tr., pp. 12:25-13:17; Breshears Decl., ¶ 8).

Other law enforcement officers started arriving, including Linn County deputies Ian Averett and Jake Merrill. (Manlove Decl., Ex. 1, Breshears Depo. Tr., p. 13:18-23; 14:14-23; Breshears Decl., ¶ 9). Both deputies Breshears and Averett called out to the women to move away from the truck. (Manlove Decl., ¶ 4, Ex. 2, Averett Depo. Tr., p. 13:11-14). APD Officer Emile arrived, followed by APD Lt. David Vaughn. (Emile Decl, ¶ 8; Vaughn Decl., ¶ 6).

Eventually, Crystal Priddy (Mr. Hamilton's sister) and Angela Bolen walked back towards the police vehicles at the entrance to the park. (Manlove Decl., Ex. 2, Averett Depo. Tr., pp. 14:25-15:4; 16:7-9; Breshears Decl., ¶ 9; Breshears Decl., Ex. 2 (dashcam video) at 03:43; Emile Decl., Ex. 2 (BWC video) at 01:16). Yolanda Priddy, however, refused to come back to where the police were. (Breshears Decl., ¶¶ 9-11, Ex. 2). The officers and deputies were asking Yolanda to move away from the truck by saying: "Yolanda. We need you to come back here please." and "Yolanda. Step away from the truck." (Emile Decl., ¶ 11, Ex. 2 (BWC video) at 01:56).

Officer Emile again tried calling Mr. Hamilton on his phone, but Mr. Hamilton, once again, did not answer. (Emile Decl., ¶ 10). Officer Emile and Lt. Vaughn asked Crystal Priddy to contact Yolanda Priddy to attempt to persuade Yolanda to move away from the pickup truck. (Emile Decl., ¶ 11; Vaughn Decl., ¶ 7). Crystal told Emile she had tried but that Yolanda Priddy was not answering her phone. (Emile Decl.,¶ 11, Ex. 2, BWC video at 04:43; See also Manlove Decl., Ex. 5, Vaughn Depo. Tr., pp. 13:25-14:11).

Lt. Vaughn was the most senior officer on scene and took command of the incident after he arrived. (Vaughn Decl., ¶ 8). Lt. Vaughn's intent in trying to get Yolanda to move away from

the truck and come back to the patrol vehicles was to try and stabilize the situation as much as possible so law enforcement could initiate contact with Mr. Hamilton in the vehicle from a more controlled and contained environment. *Id.*

LCSO Deputy Jordan Kirksey was working on February 8, 2023. (Kirksey Decl., ¶ 8). As Deputy Kirksey was coming to work, he heard over the radio from Deputy Breshears that there was a man at Freeway Lakes Park, who was at times holding a gun to his head, other persons were present pleading with the man to put the gun down and these other persons were not following police commands to move away from the man with the gun. *Id*. Deputy Kirksey advised dispatch he was enroute to Freeway Lakes Park to assist. (Kirksey Decl., ¶ 9). Deputy Averett then told Deputy Kirksey to respond directly to the scene and attempt to begin crisis negotiations with the man with the gun. (*Id*.; Manlove Decl., Ex. 2, Averett Depo. Tr., pp. 16:17-17:9). Deputy Averett had previously utilized Deputy Kirksey's crisis negotiator training on other calls. (Manlove Decl., Ex. 2, Averett Depo. Tr., pp. 18:23-19:3). As a Crisis Negotiation Team ("CNT") negotiator, Deputy Kirksey's principal task is to establish communication and build rapport with the person in crisis to influence their behavior to the best of his abilities to achieve a peaceful and safe resolution of the crisis. (Kirksey Decl., ¶¶ 4-6).

APD Detective Koddie Lowery was also working on February 8, 2023. (Lowery Decl., ¶ 5). Det. Lowery heard over the radio that APD patrol officers were responding to a call involving a man with a firearm at Freeway Lakes Park. *Id.* Det. Lowery logged into APD's mobile dispatch program and reviewed the call notes and learned the man with the firearm was Julius Hamilton. *Id.* Det. Lowery was personally acquainted with Mr. Hamilton. *Id.* From reviewing the call notes, she learned that Mr. Hamilton was intoxicated, emotionally distraught, and that his girlfriend, Angela, whom Det. Lowery was also acquainted with, was involved with the incident in some capacity. *Id.* Det. Lowery understood that other family members were present at Freeway Lakes

Park with Mr. Hamilton. *Id.* Det. Lowery advised APD dispatch that she was available to respond as a crisis negotiator. At the time she self-dispatched to the call, Det. Lowery was physically located at the APD building. However, before she could even exit the building to proceed to Freeway Lakes Park, Det. Lowery heard on the radio that shots had been fired. (*Id.*, ¶ 6).

APD Officers Eric Tress and Ken Fandrem also responded to Freeway Lakes Park. Upon arrival, Officer Fandrem parked his patrol car, facing east, towards the white pickup. (Fandrem Decl., ¶ 8). Because the call involved a gun, Officer Fandrem retrieved his patrol rifle and initially took a position behind the trunk of his car. *Id.* Officer Fandrem saw a male in the driver's seat of the pickup. (*Id.*, ¶ 9). There were at least two other persons on the other side of the pickup. *Id.* Officer Fandrem initially thought the man was holding a black cell phone, but as the man changed position, at one moment pointing the object in the direction of the women present, Officer Fandrem realized the man was holding a gun. *Id.* (See also, Manlove Decl., ¶ 5, Ex. 3, Fandrem Depo. Tr., pp. 24:13-26:23). Because Officer Fandrem was concerned about the man's movements with the gun, and the presence of other people next to the pickup, as well as being concerned that the man might point the gun at those people and shoot them, Fandrem moved to the passenger side of his patrol car, opened the passenger door, and used the open door as a resting position for his rifle and pointed his rifle towards the pickup. (Fandrem Decl., ¶ 10). At this point, Officer Fandrem still had the safety engaged on his rifle. *Id.* However, the man was lowering and raising the window of the front passenger side of the truck. As Officer Fandrem grew more concerned that the man might shoot a person standing outside the truck, Officer Fandrem took the safety off his rifle. (*Id.*, ¶ 11).

As Officer Tress got out of his patrol vehicle, he saw Officer Fandrem on the passenger side of a patrol vehicle with his rifle pointed in the direction of the pickup truck. (Manlove Decl., ¶ 6, Ex. 4, Tress Depo. Tr. pp. 17:22-18:8). Officer Tress took up a position on the other side of the patrol car from Fandrem. (Manlove Decl., Ex. 4, Tress Depo. Tr. pp. 18:22-19:3). Tress also

pointed his rifle in the direction of the white pickup. *Id.* Officer Fandrem told Officer Tress that Mr. Hamilton had a gun, and that Mr. Hamilton was mostly pointing the gun at his head but was also waving it around. (Manlove Decl., Ex. 4, Tress Depo. Tr., p. 20:11-24).

The police officers continued to ask Yolanda Priddy to move away from the truck and to come back to the police officers. (Manlove Decl., Ex. 1, Breshears Depo. Tr., pp. 14:18-15:2).

After about five minutes of voice commands to Yolanda Priddy to move away from the pickup truck and move towards the police, Officer Emile used a Public Announcement loudspeaker from a Linn County Sheriff's Office patrol vehicle to again ask Yolanda Priddy: "Please walk away from the vehicle." (Emile Decl., ¶ 12; Ex. 2, BWC video at 06:47).

The police were trying to get Yolanda Priddy back towards the police "to stabilize the situation as much as possible so [the police] could initiate contact with Mr. Hamilton." (Manlove Decl., Ex. 5, Vaughn Depo. Tr., p. 15:3-8; Vaughn Decl., ¶ 8).

### C. Mr. Hamilton Points a Pistol at Law Enforcement Officers; Officer Tress and Officer Fandrem Respond With Deadly Force

As Officer Emile was using the loudspeaker to ask Yolanda Priddy to move away from the pickup truck, Yolanda finally began to move away from the truck. (Manlove Decl., Ex. 4, Tress Depo. Tr., pp. 20:25-21:12; Breshears Decl., ¶ 11, Ex. 2, dashcam video at 11:45). However, when Yolanda Priddy was about 10 feet away from the truck, with her back turned towards Mr. Hamilton, Mr. Hamilton suddenly stood up in the doorframe of the driver's side of the pickup, brought his arm across the roof of the pickup and pointed the gun directly at Officers Fandrem and Tress and in the direction of all the police and two other civilians present. (Tress Decl., ¶ 11; Fandrem Decl., ¶ 12; Manlove Decl., ¶ 5, Ex. 3, Fandrem Depo. Tr. pp. 28:25-30:12; Breshears Decl., Ex. 2, dashcam video at 11:50). Based on what he saw, Officer Tress was certain the gun was pointed at him. (Manlove Decl., Ex. 4, Tress Depo. Tr., p. 32:5-8; Tress Decl., ¶ 11). Officer Tress heard Officer Emile yell: "Drop the gun." *Id*. Similarly, Officer Fandrem also observed that

Mr. Hamilton "brought his arm up across the pickup, pointed the gun straight back at us. And his eyes were staring at me. They were just huge...I was looking down the barrel that he was pointing at me..." (Manlove Decl., Ex. 3, Fandrem Depo. Tr., pp. 28:25-30:1; Fandrem Decl., ¶ 12).

Likewise, APD Lt. Vaughn saw Mr. Hamilton stand up in the door frame of the truck and point a handgun in the direction of the officers present. (Vaughn Decl., ¶ 9). Lt. Vaughn believed the gun was pointed at him and perceived his life to be in danger. (Manlove Decl., Ex. 5, Vaughn Depo. Tr., p. 16:3-8; Vaughn Decl., ¶ 9). Lt. Vaughn reacted by yelling "Watch out. Put the gun down," while unholstering his pistol and beginning to point it towards Mr. Hamilton. (Vaughn Decl., ¶ 9; Manlove Decl., Ex. 5, Vaughn Depo. Tr., p. 21:16-20). Linn County Deputy Merrill saw Mr. Hamilton bring the gun over the roof of the truck and point the gun in the direction of the police as well. (Manlove Decl., ¶ 8, Ex. 6, Merrill Depo. Tr., p. 23:6-15). As Officer Emile was using the loudspeaker to ask Yolanda Priddy to move away from the truck, he too saw Mr. Hamilton holding the gun and pointed in the direction of the police and reacted by stating: "Hey. Drop the gun." (Emile Decl., ¶¶ 12, 13). Finally, Angela Bolen[4] saw Mr. Hamilton stand up with the gun, and saw Mr. Hamilton come over the top of the truck with the gun. (Manlove Decl., ¶ 9, Ex. 7, Castro Depo. Tr., pp. 65:7-14; 65:24-66:1). In response, Ms. Bolen heard officers shouting: "Put the gun down. Stop..." *Id.*

When Officers Tress and Fandrem saw Mr. Hamilton point the handgun at them, they both fired one shot from their rifles. (Manlove Decl., Ex. 3, Fandrem Depo. Tr., pp. 28:25-30:12; Fandrem Decl., ¶ 13; Manlove Decl., Ex. 4, Tress Depo. Tr., p. 24:13-17; Tress Decl., ¶ 12). One of those shots struck Mr. Hamilton. *Id.*[5]

---

[4] Angela Bolen legally changed her name to Angela Castro in 2024. (Manlove Decl., Ex. 7, Castro Depo. Tr. pp. 6:9-7:4).

[5] One of the firing officers missed. Given the nature of the claims, and the fact that there are no individual defendants, determining which officer's shot struck Mr. Hamilton is immaterial to the issues raised in this motion.

The police immediately approached Mr. Hamilton behind a ballistic shield carried by Officer Emile. (Vaughn Decl., ¶ 10, Ex. 2; Tress Decl., ¶ 13; Fandrem Decl., ¶ 14; Emile Decl., Ex. 2, BWC video at 07:25). As the officers got to the pickup, Mr. Hamilton was supine on the ground next to the pickup and a black handgun was by his feet. *Id.* The police rendered emergency aid until paramedics from the Albany Fire Department arrived shortly after. *Id.* There was a partially consumed bottle of whiskey inside the cab of the pickup. (Manlove Decl., Ex. 7, Castro Depo. Tr., p. 61:11-62: 3).

**D. Linn County and City of Albany's 911 Dispatch System**

The Linn County Dispatch Communications Center ("Dispatch Center") is part of the LCSO. (McIntyre Decl., ¶ 1). The Dispatch Center serves as the Primary Safety Answering Point ("PASP") for Linn County and receives all 911 calls made from within Linn County. (*Id.*, ¶ 3). The Dispatch Center will dispatch all calls within Linn County for fire and ambulance services, except the area around Mill City and Lyons, Oregon. *Id.* If a 911 call requests or involves a law enforcement response within the police jurisdiction of another police agency within Linn County, (for example, the City of Albany Police Department ("APD")), the Dispatch Center will transfer the 911 call to those other police agencies to dispatch their own resources. (*Id.*; *See also* Johnson Decl., ¶ 3). In this case, the secondary police agency is referred to as the Secondary Public Safety Answering Point ("Secondary PSAP"). (McIntrye Decl., ¶ 3). APD has a Dispatch Communications Center ("APD Dispatch Center") and the APD Dispatch Center is a Secondary PSAP. (Johnson Decl., ¶ 3).

In the State of Oregon, local government employees who take 911 calls are referred to as either dispatchers or call takers. (McIntyre Decl., ¶ 4; Johnson Decl., ¶ 4). These employees attend an academy at DPSST for emergency dispatchers or call takers. (McIntyre Decl., ¶ 2; Johnson

Decl., ¶ 2). Successful completion of and graduation from this academy is necessary to work as an emergency dispatcher in Oregon. *Id*.

The DPSST academy trains prospective emergency dispatchers to ask a set of questions of people calling the 911 system. (McIntyre Decl., ¶ 4; Johnson Decl., ¶ 4). The questions are viewed as the most efficient method to obtain relevant information to determine the emergency response. *Id*. The categories include: (1) What? (2) When? (3) Where? (4) Who? and (5) Weapons? *Id*. The APD Dispatch Center adds a sixth "Whiskey?" to serve as a mental prompt for its dispatchers to inquire about intoxicants or drugs. (Johnson Decl., ¶ 4).

In asking about weapons, dispatchers seek to gather information about the safety and risk issues involved in the call. (McIntyre Decl., ¶ 5; Johnson Decl., ¶ 5). The weapons inquiry focuses on the presence of weapons, access to weapons at the location of the call, the past history of the use of weapons, or any history of aggression or violence associated with the involved parties, depending on the circumstances and information provided. *Id*.

Depending on the information learned about the nature of the call received from the 911 caller, and as updated from other callers or persons, dispatchers at the LCSO Dispatcher Center can dispatch a variety of emergency responders, including fire, ambulance with paramedics, sheriff's deputies, or mental health specialists, or some combination of these responders. (McIntyre Decl., ¶ 6). The APD Dispatch Center dispatches APD responders, but can ask the LCSO Dispatch Center to dispatch other resources, such as fire, ambulance with paramedics, mental health specialists, or some combination of these responders. (Johnson Decl., ¶ 6).

When the LCSO Dispatch Center receives a call involving a person in a mental or behavioral health crisis - and once the Dispatch Center has eliminated the possibility of the need for police involvement (such as a weapon being present) - the dispatcher can ask and offer the services of a mental health specialist from the Linn County Mobile Crisis Intervention Team

("MCIT"), the Veteran's Crisis Line, or the State of Oregon 988, Suicide and Crisis Line. (McIntyre Decl., ¶ 7). The MCIT is part of Linn County's Mobile Crisis Intervention Services ("MCIS"), and the LCSO collaborates with MCIS. *Id*. The MCIT will respond to people experiencing a mental or behavioral health crisis to employ effective communication and de-escalation techniques with the person in crisis. *Id*. Similarly, when the APD Dispatch Center receives a call involving a person in mental or behavioral health crisis, the APD dispatcher can contact Linn County's MCIS and collaborate with MCIS for activating the MCIT. (Johnson Decl., ¶ 7).

However, if the LCSO Dispatch Center receives a 911 call involving a person experiencing a mental or behavioral health crisis but determines there is a safety risk involving the presence of a weapon, the LCSO Dispatch Center will in every case first dispatch a law enforcement agency to the call. (McIntyre Decl., ¶ 8). The APD Dispatch Center follows the same protocol. (Johnson Decl., ¶ 8). Once the responding law enforcement officers determine the scene is safe, those officers can request an MCIT response, either by requesting the MCIT through the LCSO Dispatch Center or by contacting the MCIT directly by phone or page. (McIntyre Decl., ¶ 8). APD officers follow the same protocol. (Johnson Decl., ¶ 8). In addition, once APD officers determine the scene is safe, APD officers can also request the services of an APD Mental Health Intervention Specialist. *Id*. However, neither APD's Mental Health Intervention Specialist nor Linn County's MCIT will enter a scene until the scene is deemed safe by responding law enforcement officers. (McIntyre Decl., ¶ 8; Johnson Decl., ¶ 8; Harnden Decl., ¶¶ 7-10, Exs. 1-3; Kirksey Decl., ¶ 7).

### E. Mr. Hamilton Was Never Diagnosed or Treated for Any Sort of Mental Health Disability

By February 8, 2023, Mr. Hamilton and Ms. Bolen had dated for about three years. (Manlove Decl., Ex. 7, Castro Depo. Tr., p. 12:18-22). Prior to this date they had been going through a breakup since around Christmas of 2022. (*Id*., at pp. 26:1-15; 48:23-49:20). Although

Ms. Bolen thought that Mr. Hamilton was upset about the breakup of their relationship, she did not consider Mr. Hamilton depressed. (*Id*., at p. 50:10-13). In fact, on February 8, 2023, they woke up together, she went to work, and there was "nothing out of the ordinary." (*Id*., at p. 52:6-25). Ms. Bolen had never known Mr. Hamilton to receive any mental health treatment, nor did she ever feel that he needed it. (*Id*., at p. 48:13-22). She never knew Mr. Hamilton to take pills, drugs, or use marijuana. (*Id*., at p. 46:16-24). She never thought he had a drinking problem. (*Id*., at pp. 46:25-47:7). Prior to February 8, 2023, Mr. Hamilton had never expressed any suicidal thoughts to her. (*Id*., at p. 48:13-16).

Similarly, Mr. Hamilton's mother, Yolanda Priddy, never had any concerns for Julius' mental health and he never expressed anything alarming to her. (Manlove Decl., Ex. 8, Yolanda Priddy Depo. Tr., pp. 46:17-47: 1). Yolanda Priddy was never aware of Mr. Hamilton receiving any sort of mental health treatment at any time. (*Id*., at p. 68:7-10). Yolanda Priddy did not think Mr. Hamilton had an alcohol or drug problem. (*Id*., at 32:11-25). Yolanda Priddy had no concerns that he had any drug problem. *Id*. While she was standing next to the truck at Freeway Lakes Park, Yolanda Priddy could tell her son had been drinking, although he did not seem "sloppy drunk" to her. (*Id*., at pp. 52:13-53:1).

As noted above, Plaintiff's Complaint focuses on allegations related to responding to a person in a mental health crisis and states explicitly at paragraph 48 that "Julius Hamilton met the applicable definition of disability provided under both Title II of the ADA and 29 C.F.R. § 1630.2(g)(iii)." (ECF 1, ¶ 48). No details are provided in the complaint, but during discovery Plaintiffs confirmed there was no such diagnosis present and that, instead, these allegations refer to "Asthma," "Atopic Dermatitis," and "Extreme reactions to seafood." (Manlove Decl., Ex. 10, p. 2; Ex. 11, p. 3).

//

## III. Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed R Civ P 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed R Civ P 56(e); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986).

"A Summary Judgment Motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). It is only the material facts that come into play. A fact is "material" when it is relevant to an element of a claim or when its existence might affect the outcome of the suit. *TW Elec. Service Inc. v. Pacific Elec. Contractors Ass'n*., 809 F.2d 626, 630 (9th Cir. 1987). If the non-moving party's facts, together with undisputed background or contextual facts, do not show the non-moving party to be justified to a jury verdict in its favor, summary judgment is appropriate. (*Id.* at 631). One of the principal purposes of a summary judgment procedure is to isolate the disposal of claims that are not factually supported, and the rule is to be interpreted to accomplish this purpose. *Celotex*, 477 U.S. at 323-24. The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient[.]" *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). Thus, where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587.

For the reasons that follow, there are no material issues of fact in this matter and Defendants are entitled to summary judgment.

## IV. Argument

### A. The Linn County Sheriff's Office and the Albany Police Department Are Not Proper Parties.

Plaintiffs name four defendants in their action: Linn County, the City of Albany, the Albany Police Department, and the Linn County Sheriff's Office. (ECF 1, ¶¶ 5-8). However, under the ADA, RA and 42 U.S.C. § 1983, neither the Albany Police Department nor the Linn County Sheriff's Office are proper defendants. *Updike v. Clackamas County*, Case No. 3:15-cv-00723-SI, 2015 WL 7722410, at * 3-4 (D. Or. November 30, 2015) (In Oregon, police departments and sheriff's offices are not a separate legal entity subject to suit).

On this basis alone, the Court should dismiss the Linn County Sheriff's Office and the Albany Police Department as defendants from Plaintiffs' action. Fed. R. Civ. P. 17(b)(3); Fed. R. Civ. P. 56(a).

### B. Statutory Overview

1. <u>Elements of a Title II American with Disabilities Act ("ADA") Claim and a Section 504 Rehabilitation Act ("RA") Claim</u>

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "To state a prima facie case for a violation of Title II, "a plaintiff must show: (1) he is a 'qualified individual with a disability'; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Payan v. Los Angeles Community College District.*, 11 F.4th 729, 737 (9th Cir. 2021) (quoting *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001) (citation omitted).

Title II's prohibition on discrimination in public programs applies to a wide variety of public functions and "bring[s] within its scope anything a public entity does." *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (quotation marks omitted) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001)). In the Ninth Circuit, Title II of the ADA applies to arrests and other on-the-street law enforcement responses to reported disturbances or other incidents. *See Sheehan v. City and Cnty. of San Francisco*, 793 F.3d 1009 (Mem) (9th Cir. 2015); *Sheehan v. City and Cnty. of San Franciso*, 743 F.3d 1211, 1232 (9th Cir. 2014). *See also, Bresaz v. County of Santa Clara*, 136. F. Supp. 3d. 1125, 1131-33, 1135-37 (N.D. Cal. 2015); *Klamut v. California Highway Patrol*, Case No. 15-cv-02132-MEJ, 2015 WL 9024479 (N.D. Cal. Dec.,16, 2015).

In *Sheehan*, the Ninth Circuit recognized two types of ADA claims applicable to arrests and on-the-street law enforcement responses: (1) wrongful arrest, "where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity;" and (2) reasonable accommodation, where police "fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Sheehan*, 743 F.3d at 1232. In a Title II claim grounded in a public entity's failure to provide a reasonable accommodation, an ADA plaintiff also bears the initial burden of producing evidence of a reasonable accommodation. *Sheehan, supra*, at 1232-33. In turn, a public entity may defeat a reasonable accommodation claim by showing "that making the modifications would fundamentally alter the nature of the service, program, or activity." *Sheehan, supra*, at 1233 (citing 28 C.F.R. 35.130(b)(7)).

Section 504 of the Rehabilitation Act similarly prohibits disability discrimination by recipients of federal funds. 29 U.S.C. § 794. The elements of a prima facie Section 504 claim are similar to those of a Title II ADA claim, "with the additional requirement that the plaintiff prove

that "the program receives federal financial assistance."" *Payan*, at 738 (quoting *Duvall, supra* at 1135).

Both Title II and Section 504 claims "are interpreted coextensively because "there is no significant difference in the analysis of rights and obligations created by the two Acts."" *Payan* at 737, (quoting *K.M. ex. rel. Bright v. Tustin Unified Sch. Dist*., 725 F.3d 1088, 1098 (9th Cir. 2013). *See also Gillette v. Oregon*, 3:20-CV-00513-IM, 2022 WL 2819057, at *8 (D. Or. July 19, 2022) (Courts ""analyze ...ADA and Rehabilitation Act claims together because the statutes provide identical remedies, procedures and rights."") (quoting *Vos v. City of Newport Beach*, 892 F.3d 1024, 1036 (9th Cir. 2018) (simplified)).

2. Theories of Liability Under the ADA and Section 504

"A disability discrimination claim may be based on 'one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation.'" *Payan v. L.A. Cmty. Coll. Dist*., 11 F.4th 729, 738 (9th Cir. 2021) (quoting *Davis v. Shah*, 821 F.3d 231, 260 (2nd Cir. 2016)). "The important difference between [a disparate impact claim and a failure to reasonably accommodate claim] is that a reasonable accommodation claim is focused on an accommodation based on an individualized request or need, while a reasonable modification [claim] in response to a disparate impact finding is focused on modifying a policy or practice to improve systemic accessibility." *Id.* The terms "reasonable accommodation" and "reasonable modification" "create identical standards and may be used interchangeably." *Where Do We Go Berkeley v. California Dept. of Transportation*, 32 F. 4th 852, 860, n. 4 (9th Cir. 2022), quoting *Payan, supra*, 11 F.4th at 738, n. 4.

Plaintiffs fail to allege with clarity which, if any, of these theories of liability they pursue. (*See* Complaint, ¶¶ 51-55). While unclear as to their particular theory, the gravamen of the allegations are that Mr. Hamilton was somehow subject to some kind unequal access to the

defendants' emergency response due to his alleged *mental* health condition as compared to the defendants' alleged emergency responses to persons experiencing a *physical* health emergency. (*See* ECF 1, ¶¶ 52, 53). In this regard, a fair characterization of Plaintiffs' theory of liability is that Mr. Hamilton was denied 'meaningful access' to emergency services because of his alleged mental health. *See Crowder v. Kitagawa*, 81 F.3d 1480, 1484-85 (9th Cir. 1996) (Rather than classifying discrimination as 'deliberate' or 'disparate impact', the court found it more useful to assess whether disabled persons were denied 'meaningful access' to state-provided services).

3. <u>Money Damages Requires the *Mens Rea* of Intentional Discrimination.</u>

Notably, any claim for money damages under either Title II of the ADA or Section 504 of the RA requires the plaintiff to prove the defendant's discrimination was done intentionally. *Wallace v. Washington Cnty. Jail*, 3:18-CV-1975-SI, 2023 WL 4744740, at *7 (D. Or. July 25, 2023) citing *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998); *See also O'Doan v. Sanford*, 991 F.3d 1027, 1045 n. 3 (9th Cir. 2021) (To make out a claim and recover money damages under the ADA, a plaintiff must "prove intentional discrimination on the part of the defendant."); *Goodwin v. Marin Cnty. Transit Dist.*, 675 F. Supp. 3d 1016, 1025 (N.D. Cal. 2022) (citing *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001) ("In an action for monetary relief under Title II, a plaintiff must additionally allege intentional discrimination by the defendant.")).

Proof of intentional discrimination is met through a showing of "deliberate indifference." *O'Doan, supra*, 991 F.3d at 1045, n.3; *Goodwin, supra,* (citing *Duvall, supra* at 1139). ("Intentional discrimination under the ADA means "that the deliberate indifference standard applies.""). Deliberate indifference requires both (1) "knowledge that a harm to a federally protected right is substantially likely," and (2) "a failure to act upon that…likelihood." *Updike v. Multnomah County*, 870 F.3d 939, 951-52 (9th Cir. 2017); *Duvall*, *supra*, 260 F.3d at 1139.

Significantly, however, deliberate indifference "must be a result of conduct that is more than negligent, and involves an element of deliberateness." (*Id*. at 951-52). A simple oversight of carrying out a duty, "bureaucratic slippage," or a complaint reasonably "result[ing] from events taking their normal course" do not constitute deliberate indifference. (*Id*., citing *Duvall, supra* at 1139).

4. Limits to ADA Title II and Section 504 Claims

The legislative focus of ADA Title II and Section 504 of the RA is to prohibit unlawful discrimination on the basis of qualifying physical or mental disabilities. In that regard, the legislative focus of both laws is limited. Accordingly, neither law extends to the following areas:

(A) The ADA does not require fundamental alterations of services or activities.

Title II's implementing regulations require state agencies to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, *unless* the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i) (Emphasis added.) A disabled plaintiff seeking a modification of existing rules as a reasonable modification or accommodation has the burden of showing that the requested modification would enable him to participate in the subject service, program or activity. *Matthews v. NCAA*, 179 F. Supp. 2d 1209, 1225 (E.D. Wash. 2001). If the disabled plaintiff meets this initial burden, the defendant may avoid the request by showing the requested modification would fundamentally alter the nature of the program or activity. *Id*. A "fundamental alteration" can occur if "an essential aspect of a defendant's policies or programs would be unacceptable *even if applied to everyone equally*[.]" *Id*. (Emphasis added).

//

//

(B) The ADA does not impose any "standard of care."

In addition, "a disability discrimination claim may not be premised upon allegations that defendants failed to meet a particular standard of care with regard to the services provided..." *Lane v. Kitzhabe*r, 841 F. Supp. 2d 1199, 1207 (D. Or. 2012). For example, in the context of medical care, the U.S. Supreme Court has explained "[w]e do not in this opinion hold that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.'" *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603 n. 14, (1999). Relatedly, the ADA does not support a claim for "inadequate treatment for disability." *Simmons v. Navajo County, Arizona*, 609 F.3d 1011, 1022 (9th Cir. 2010) ("[T]o the extent that the [plaintiffs] argue that [the defendant] violated the ADA by depriving [the decedent] of 'programs or activit[ies] to lessen his depression,' such argument is not actionable under the ADA [because] the ADA prohibits discrimination because of disability, not inadequate treatment for disability."); *See also Washington v. Cal. Dep't of Corr. & Rehab.*, No. 19-cv-169-VAP (KK), 2019 WL 1206487, at *6 (C.D. Cal. Mar. 14, 2019), aff'd 2019 WL 3295644 (C.D. Cal. Apr. 22, 2019) ("To the extent [the plaintiff] seeks to sue Defendants for alleged inadequate healthcare under the ADA or Rehabilitation Act, such a claim fails as a matter of law."). In other words, the gravamen of any claim under the ADA or Section 504 must be a focus on *discriminatory services* as opposed to *inadequate services*.

As a consequence, any theories or arguments that Defendants' employees failed to employ their preferred tactics in handling the exigent situation created by Mr. Hamilton's waving a gun around and then pointing it at officers should be summarily rejected. Such theories or arguments are equivalent to arguing that defendants' employees failed to meet some (unidentified) standard of care which fails as a matter of law under the ADA and Section 504.

//

### C. Mr. Hamilton Was Not a Qualified Person Under the ADA With a Covered Disability. A Single Episode of Suicidal Ideation is Not a Qualifying Disability.

The ADA defines "disability" as:

(A) A physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) A record of such impairment; or
(C) Being regarded as having such an impairment.

42 USC § 12102(1).

With respect to subparagraph (A), the phrase "physical or mental impairment" means "any mental or psychological disorder" including "emotional or mental illness." 28 C.F.R. § 35.104; 28 C.F.R. § 35.108(1)(ii). However, even for purposes of ruling on motions to dismiss under FRCP 12(b)(6), courts require plaintiffs to allege with "some factual specificity" the nature of the covered disability. *Klamut v. California Highway Patrol*, Case No. 15-cv-02132-MEJ, 2015 WL 9024479, at * 7, (N.D. Cal., 2015). Simply alleging that a plaintiff has a ""mental illness," without more, is a "formulaic recitation of the elements of a cause of action" under the ADA and does not satisfy [the plaintiff's] pleading obligations." (*Id.*, quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *Longariello v. Gompers Rehab. Ctr*., 2010 WL 94113, at *3 (D. Ariz., 2010) ("Merely labeling himself as 'disabled' in the Complaint is insufficient to explain what physical or mental disability [the plaintiff] has."); *Lambdin v. Marriott Resorts Hosp. Corp*., 2015 WL 263569, at *2 (D. Haw. Jan. 21, 2015) ("It is not enough for [the plaintiff] to state, in conclusory fashion, that he has a disability. Having been injured or living with an impairment does not necessarily guarantee that one is protected by the ADA.")).

In the present case, when describing the incident at Freeway Lakes Park on February 8, 2023, Plaintiffs describe Mr. Hamilton as "experiencing a mental health emergency" or "mental health crisis" with "suicidal ideation" and as "distraught and potentially intoxicated." (ECF 1, ¶¶ 18, 19, 23, and 24). From this description, Plaintiffs then simply state in a conclusory fashion that

"Julius Hamiton met the applicable definition of disability provided under Title II of the ADA." (Complaint, ¶ 48). Similarly, with respect to Plaintiff's RA claim, Plaintiff – again in a conclusory fashion – says "Julius Hamilton was a qualified individual with disabilities or perceived disabilities protected by Section 504 of the Rehabilitation Act." (Complaint, ¶ 63). Even if we were applying pleading standards, Plaintiffs have failed to adequately allege that Mr. Hamilton suffered from a covered disability under the ADA and RA. The undisputed facts show that Julius Hamilton did not suffer from a covered mental health disability under the ADA or RA. (Manlove Decl., Ex. 10, p. 2; Ex. 11, p. 3).

Second, - to emphasize the previous point - to the extent Plaintiffs claim under subparagraph(A) that Mr. Hamilton had a qualifying disability under the ADA because of his emotional distress and suicidal behavior exhibited at Freeway Lakes Park on February 8, 2023, Plaintiffs' claim fails. A single episode suffered by an individual with no diagnosis, with no record of treatment, and with no history of mental impairment is insufficient to constitute a mental impairment under the ADA. *Bresaz v. Couinty of Santa Clara,* 136 F. Supp. 3d. at 1135.

*Bresaz v, County of Santa Clara, supra*, is instructive. In *Bresaz,* an employee, Mr. Bresaz, became delusional and began to act inappropriately at work. Mr. Bresaz' fellow employees called 911 for assistance, even though none of the employees reported that Mr. Bresaz posed a threat of violence or criminal behavior. (*Id.* at 1128). Paramedics arrived and spoke to Mr. Bresaz' father by cellphone, who told the paramedics to take Mr. Bresaz to the hospital. *Id*. Subsequent to the arrival of the paramedics, two law enforcement deputies arrived on scene. The paramedics allegedly told one of the deputies that Mr. Bresaz was a psychiatric patient, that he was experiencing a medication imbalance, and that he was agitated. *Id.*

The two deputies approached Mr. Bresaz, causing Mr. Bresaz to become even more upset and agitated. (*Id*. at 1129). Mr. Bresaz began to fidget with a keychain. One of the deputies moved

quickly towards Mr. Bresaz with his gun drawn. *Id.* Mr. Bresaz reacted by swinging the keychain at the deputy. The deputy responded by shooting Mr. Bresaz in the stomach. *Id*. Mr. Bresaz later died of the gunshot wound. *Id*.

Mr. Bresaz' estate filed a complaint claiming Mr. Bresaz suffered a violation of various rights, including rights protected under the ADA. The estate alleged that Mr. Bresaz was "an individual with a disability within the meaning of the ADA" and that the defendants had deprived Bresaz of rights under Title II of the ADA by "denying him the benefit of the County's emergency health services." (*Id*. at 1131).

The *Bresaz* court analyzed the alleged disability through the lens of the 2008 amendments to the ADA, 42 U.S.C. § 12102. (*Id*. at 1134). The court noted that while the ADA amendments broadened the definition of "substantially limits" under subsection (A) of the statute, the amendments did not broaden the standard for a qualifying physical or mental impairment that constitutes a covered disability. (*Id*. at 1134-35). In particular, the court noted that while the amendments included impairments that might be episodic or in remission as qualifying impairments, conditions that occurred at a single time, without any medical diagnosis, do not. (*Id*. at 1136). The court explained that courts have interpreted the ADA amendments to treat "episodic as implying that a condition occurs intermittently or occasionally but, *at minimum*, that the condition occurs *more than once*." *Id.* The *Bresaz* court concluded:

"Plaintiffs have cited no case law, and the Court has found none, where a party has stated a cognizable ADA disability discrimination claim *based on a single, isolated incident of mental illness, particularly where there is no diagnosis of mental illness or history of mental illness*." (*Id*. at 1137). (Emphasis added).

Third, with respect to subparagraph (B) of the statute, the phrase "a record of such an impairment" means having "a history of ...mental or physical impairment that substantially limits

one or more major life activities." 28 C.F.R. § 35.108(e)(1).[6] Mr. Hamilton's family and closest associates confirmed he never showed signs of or received any sort of treatment for mental health issues. (Manlove Decl., Ex. 7, Castro (recent girlfriend) Depo. Tr., pp. 46:16-47:7, 48:13-22; Manlove Decl., Ex. 8, Yolanda Priddy (mother) Depo. Tr., pp. 32:11-25, 46:17-19, 46:25-47:1, 47:7-10, 67:4-13, 68:7-10; Manlove Decl., Ex. 9, Rickey Hamilton (father) Depo. Tr. p. 31:6-14)).

In fact, in response to defendants' interrogatories asking Plaintiffs to identify any covered disability referenced in the Complaint, Mr. Hamilton's parents responded with "Asthma. Atopic Dermatitis. Extreme reactions to seafood." (Manlove Decl., Ex. 10, p. 2; Ex. 11, p. 3). Clearly, Mr. Hamilton's asthma, atopic dermatitis, and extreme reactions to seafood have nothing to do with Plaintiffs' ADA or Section 504 theories of recovery.

Finally, with respect to subparagraph (C) of the statute, Plaintiffs allege Julius Hamilton was perceived by responding officers as "having a mental health disability" or was "a qualified individual with ... perceived disabilities." (Complaint, ¶¶ 48, 63). To the extent Plaintiffs claim that Mr. Hamilton was entitled to a reasonable modification to the defendants' officers and deputies emergency response because defendants or any of their employees "regarded [Mr. Hamilton] as having" "a mental impairment" due his emotional distress and apparent suicidal behavior at the Freeway Lakes Park, that theory also fails as a matter of law. *See Bresaz*, 136 F. Supp. 3d at 1133. Under 42 USC § 12201(h), "a public entity under subchapter II...need *not* provide a reasonable accommodation or reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability in section 12102(1) of this title *solely* under subparagraph (C) of such section." (Emphasis added). *See also* 28 C.F.R. § 35.108(f)(3) (same). In other words, if Plaintiffs' ADA claim is premised solely on the subjective

[6] In addition, "[a] public entity is not required to provide a reasonable modification to an individual who meets the definition of a disability solely under the "record of" prong [of the statute]." 28 C.F.R. § 35.108(e)(3).

impressions or beliefs of Defendants' employees, Plaintiffs' ADA claim fails as a matter of law. Defendants would not have been obligated to reasonably accommodate Mr. Hamilton even if Defendants' employees subjectively regarded Mr. Hamilton as suffering from a disability. *Id.*; *See also Kalmut v. California Highway Patrol*, Case No. 15-cv-02132-MEJ, 2015 WL 9024479, at * 8, (N.D. Calif. December 16, 2015) (same). [7]

Nor is a single episode of intoxication –whether by a legal drug like alcohol or by an illegal substance - even in combination with suicidal ideation, a covered disability under the ADA. *See Eagon v. Cabell County Emergency Medical Services*, 766 F. Supp. 3d 623, 633 (S.D.W.V., 2025); *Ogan v. Newport Cafe*, No. 6:23-00452-AA, 2023 WL 7622098, at *3 (D. Or. Nov. 14, 2023).

The undisputed, material facts in this case show that prior to any of defendants' employees responding to the emergency call to Freeway Lakes Park, Mr. Hamilton had been drinking, was emotionally upset, and was holding a firearm and waving it around inside his pickup truck. (Manlove Decl., Ex. 7, Castro Depo. Tr., at 60:11-62:18; Manlove Decl., Ex. 8, Yolanda Priddy Depo. Tr., pp. 51:1-53:1). After Defendants' employees arrived on scene, Mr. Hamilton continued to be intoxicated to some degree, continued to be emotionally upset, and continued to wave the handgun around inside the truck. *Id.* Mr. Hamilton was only killed when he stepped out of the driver's seat of his truck, stood on the running board, and pointed the handgun directly at Officers Fandrem and Tress. (Fandrem Decl., ¶ 9; ¶¶ 12-13; Tress Decl., ¶¶ 10-12).

---

[7] In addition, a subjective belief that a person has a disability "shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." 42 USC § 12102(3)(B). *See Foulke v. Weller*, No. 22-13942, 2024 WL 2761778, at *9 (11th Cir., 2024) ([A]n acute mental health crisis is a "transitory" impairment and thus does not qualify as a "disability" [under the "being regarded as having a disability" part of the ADA]).

It would be absurd if the ADA or RA somehow required the government to respond to Mr. Hamilton's presentation of a firearm in a public park with unarmed professionals simply because he was perceived to be intoxicated and/or suicidal. That legal absurdity does not exist in the law.

The Court should grant defendants' motion for summary judgment. Fed. R. Civ. P. 56(a).

### D. Plaintiffs Seek an Unreasonable Modification of Defendants' Emergency Response Services. Alternatively, Plaintiffs Seek a Fundamental Alteration of Defendants' Emergency Response Services.

Plaintiffs essentially allege that because defendants in every case dispatch emergency medical services to those experiencing *physical* health issues, but do not in every case dispatch mental health services to those experiencing *mental* health issues, defendants have somehow violated the ADA and RA. (See Complaint, ¶¶ 52-53). Plaintiffs allege that although Linn County "has appropriate, non-police responses, such as a mobile crisis team, available to dispatch to mental health crises…armed deputies [are dispatched] as default primary responders." (Complaint, ¶ 54). These *alleged* facts are inconsistent with reality.

First, dispatchers at both the LCSO and APD Dispatch Centers attend and graduate from the State of Oregon's DPSST dispatcher academy. (McIntyre Decl., ¶ 2; Johnson Decl., ¶ 2). At this academy, dispatchers are trained to ask 911 callers a category of questions to obtain relevant information to determine the emergency response. (McIntyre Decl., ¶ 4; Johnson Decl., ¶ 4). One of the questions involves asking the 911 caller about weapons. *Id*. In asking about weapons, dispatchers are seeking to gather information about the safety and risk issues involved in the call. (McIntyre Decl., ¶ 5; Johnson Decl., ¶ 5).

Consequently, based on these standard, state-wide dispatch protocols, armed deputies are *not* dispatched as "default primary responders" to every call involving a mental health crisis. Both the LCSO and APD Dispatch Centers will dispatch emergency responders, who, depending on the nature of the information received from callers, and as updated from other callers or persons, can

include police, fire, ambulances with paramedics, or mental health specialists, *or some combination of these responders*. (McIntyre Decl., ¶ 6; Johnson, ¶ 6) (Emphasis added). While the APD Dispatch Center dispatches law enforcement offers only, it works with and can request additional resources be dispatched including other emergency responders, and mental health specialists. (Johnson Decl., ¶ 7). Also, when the APD Dispatch Center receives a call involving a person in mental or behavioral health crisis, the APD dispatcher can contact the Linn County Mobile Crisis Intervention Services ("MCIS"). *Id*. MCIS provides the Mobile Crisis Intervention Team ("MCIT") whose members respond to persons experiencing a mental or behavioral health crisis to employ effective communication and de-escalation techniques with the person in crisis. *Id*. In addition, APD staffs a Mental Health Intervention Specialist ("MHIS") who gives APD officers access to a mental health professional who can intervene and assist in connecting individuals experiencing mental, emotional, or behavioral issues and/or who are suffering addiction disorders to the appropriate resources. (Harnden Decl., ¶ 6; Exs. 2-3).

As long as LCSO Dispatch Center can eliminate the need for police involvement (such as an individual waiving around a firearm in a public park), the Dispatch Center can offer a variety of non-police resources. The dispatchers can ask and offer the services of a mental health specialist from the Linn County MCIT, the Veteran's Crisis Line, or the State of Oregon 988, Suicide and Crisis Line. Trained counselors on the 988 line are available 24 hours a day, 7 days a week to talk, text or chat. (McIntyre Decl., ¶ 7). The LCSO Dispatch Center also coordinates with the MCIS, which can send MCIT members to crisis calls. *Id*.

Second, Plaintiffs allegations of unlawful ADA and RA discrimination gloss over the realities of an undisputed, material fact: 911 calls involving weapons, especially a firearm presenting a public safety risk, in every case will receive a police response. (McIntyre Decl., ¶ 8; Johnson Decl., ¶ 8). In other words, the emergency response is consistent whether the person with

a gun is experiencing a physical health issue, or the person with the gun is experiencing a mental health issue. *Id*. When the responding law enforcement officers determine the scene is safe, those officers can request an MCIT response, either by requesting the MCIT response through either defendants' Dispatch Centers, or by contacting MCIT directly by phone or pager. *Id.* The MCIT will not enter a crisis scene until the scene is deemed safe by the responding law enforcement agency. (*Id.*; Kirksey Decl., ¶ 7; Smith Decl., ¶ 6; Harnden Decl., ¶¶ 7, 8, Ex. 1, Intergovernmental Agreement, p. 3, ("Linn County Mental Health personnel are not armed and will stay away from the location where there is a safety risk and wait for the scene to be made safe.")). In fact, by Oregon administrative rule, local crisis teams like Linn County's MCIT "must follow their established procedures to ensure safety at the service location for all parties and must continue to monitor safety." OAR 309-072-0150(1) (Effective January 1, 2023).

Finally, the undisputed facts show that defendants' employees who were responding to the call involving Mr. Hamilton were trained in crisis intervention communication and de-escalation techniques, including training related to responding to calls for suicidal subjects. (Emile Decl., ¶ 4; Vaughn Decl., ¶ 4; Fandrem Decl., ¶ 4; Tress Decl., ¶ 4). Defendants had other employees, crisis negotiators with the regional SWAT team, who had enhanced training and experience in crisis intervention, also responding to the incident with Mr. Hamilton. (Kirksey Decl., ¶¶ 4-6, 8, 10; Lowery Decl., ¶¶ 2-6).

As noted earlier, Plaintiffs' claim of unlawful discrimination under the ADA or RA appears to be that law enforcement officers should not be dispatched to the scene of a mental health or behavioral health crisis call, *regardless* of the public safety risk, and even when a firearm is being waved around. (ECF 1, ¶ 54). However, public safety and exigencies bear directly on the reasonableness of any modification under Title II of the ADA or the RA. "A modification's reasonableness depends on how it impacts the goals of an agency's program. For programs

designed to address risks to the public, reasonableness depends on the nature of the risk, whether the proposed modification would affect the agency's ability to address the risk, and the probability of worsening the risk if the agency is forced to alter its programs." *Where Do We Go Berkeley v. California Dept. of Transportation*, 32 F.4th 852, 862 (9th Cir. 2022). Any emergency response that prohibits sending an armed response to an armed subject has not just the *probability*, but the *certainty*, of worsening the public safety risks.

Exigencies bear directly on the reasonableness or need for any modification. *See Mayfield v. City of Mesa*, 131 F.4th 1100, 1110 (9th Cir. 2025) ("[T]he court must also consider whether any "exigent circumstances" surrounding the plaintiff's encounter with law enforcement would render a proposed reasonable accommodation impracticable.") "[E]xigent circumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonable analysis under the Fourth Amendment." *Id*. (*quoting Sheehan*, 743 F.3d at 1232); *See also Waller v. City of Danville, Virginia*, 515 F. Supp. 2d 659, 664-65 (W.D. Virginia, 2007) (police special response team shooting of mentally ill hostage taker perceived to be holding bladed weapon and approaching officers, reasonable under the ADA, collecting cases, and noting that "to hold otherwise would be to command police everywhere to retain a psychiatrist or social worker to take first crack at every hostage situation, no matter the threat to life or limb. Neither the text nor the intent of the [ADA] contemplates such commandeering of police authority in life-threatening situations.").

Consequently, Plaintiffs demand for Defendants to modify their existing emergency dispatch and response practices is an unreasonable modification request under the ADA and RA. For these same reasons, Plaintiffs' demands would create a fundamental alteration of Defendants' emergency dispatch and response practices.

For all of these reasons, the Court should grant Defendants' motion for summary judgment. Fed. R. Civ. P. 56(a) as against Plaintiff's ADA and RA claims.

**E. Plaintiffs Are Not Entitled to Any Damages.**

Assuming Plaintiffs could prove that Mr. Hamilton qualified as "disabled" under the ADA –which they cannot- in order to recover damages, Plaintiffs must still show defendants were deliberately indifferent to Mr. Hamilton's disability. Plaintiffs cannot make this necessary showing.

The undisputed, material facts show that the Defendants are mindful that the people they serve may experience mental health or behavioral health crises. As such, defendants have structured their emergency dispatch practices in ways that reflect this awareness. (*See* McIntrye Decl., ¶¶ 7, 8; Johnson Decl., ¶¶ 7, 8). As such, defendants have ensured that the law enforcement personnel they employ are trained in communication and de-escalation skills, including training to respond to suicidal subjects. (Smith Decl., ¶ 4; Harnden Decl., ¶¶ 2, 4; Vaughn Decl., ¶ 4). Defendants have ensured that their law enforcement personnel have access to specialized resources and personnel they can use to assist in responding to calls involving persons experiencing a mental health or behavioral health crisis. (Smith Decl., ¶¶ 5, 6; Harnden Decl., ¶¶ 5-7). And some of defendants' employees, members of the regional SWAT team, even have enhanced training and experience in responding to mental health and behavioral health-related calls for service. (Kirksey Decl., ¶¶ 4-6; Lowery Decl., ¶¶ 2-4).

As noted earlier, deliberate indifference requires both (1) "knowledge that a harm to a federally protected right is substantially likely," and (2) "a *failure to act* upon that…likelihood." *Updike v. Multnomah County*, 870 F.3d 939, 951-52 (9th Cir. 2017). (Emphasis added).

Plaintiffs cannot show that defendants failed to act upon any rights likely protected by the ADA or RA in their emergency response to the incident with Mr. Hamilton. As a result, Plaintiffs

are not entitled to any money damages. *O'Doan v. Sanford*, 991 F.3d 1027, 1045, n. 3 (9th Cir. 2021).

### F. Because Julius Hamilton Posed an Immediate Threat When He Pointed the Handgun at Defendants' Officers, He Was Not Entitled to Any Accommodation Under the ADA.

Without doubt, at the moment Mr. Hamilton raised and pointed his pistol at Defendants' law enforcement personnel, he was not entitled to any accommodation under the ADA. See 28 CFR § 35.139 Direct Threat. Subpart (a) states: "This part does not require a public entity to permit an individual to participate in or benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others."

### G. Mr. Hamilton's Alleged Disability Did Not Cause the Shooting.

A Title II ADA discrimination plaintiff must show that the adverse action would not have occurred but for the disability. *Mehta v. City of Sunnyvale*, 721 F. Supp. 3d 1041, 1046-47 (N.D. Calif. 2024). *See also Murray v. Mayo Clinic*, 934 F.3d 1101, 1105 (9th Cir. 2019) (applying but for standard to ADA claims under Title I.); *King v. Hendricks County Commissioners*, 954 F.3d 981, 984 (7th Cir. 2020) (holding that but for standard applies to ADA claim involving police shooting of mentally ill man during exigent circumstances).

In the present case, the undisputed, material facts show Mr. Hamilton was shot not because he was allegedly having a "mental health emergency" or because he was emotionally distraught and intoxicated. (ECF 1, ¶ 18). Rather, Mr. Hamilton was shot only when he raised the pistol and pointed it at Defendants' officers. As a result, there is no but for causation between any alleged disability and Mr. Hamilton's death.

The Court should grant Defendants' motion for summary judgment on this basis as well. Fed. R. Civ. P. 56(a).

//

### H. There is no *Monell* Violation for Any Alleged Failure to Train, Supervise or Discipline.

On the face of their Complaint, Plaintiffs' *Monell* claim is based on conclusory allegations of 4th and 14th Amendment violations only. (ECF 1, ¶¶ 71, 78). Plaintiffs have not independently pled any violation of these amendments.

To the extent Plaintiffs are claiming that the police shooting of Mr. Hamilton was excessive force, such a claim is a "seizure" and is evaluated under the reasonableness standard of the 4th Amendment only. *Graham v. Conner*, 490 U.S. 386, 396 (1989). However, the undisputed, material facts show that Plaintiffs cannot show any violative excessive force occurred. "Our case law is clear that when a suspect reaches for a gun or aims a weapon at officers, responding with deadly force does not violate the Constitution." *Sabbe v. Washington Cnty. Bd. of Commissioners*, 84 F.4th 807, 828 (9th Cir. 2023); *Estate of Strickland v. Nevada County*, 69 F.4th 614, 620 (9th Cir. 2023) ("[W]hen a suspect points a gun in an officer's direction, "the Constitution undoubtly entitles the officer to respond with deadly force." *quoting George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013).

1. <u>Plaintiffs Have Failed to Prove a Violation of the 4th or 14th Amendments or of the ADA or RA.</u>

A public body subject to 42 U.S.C. § 1983 cannot be held liable under section 1983 if there is no underlying violation of the constitutional or other federally protected right by the public body's employees. *Long v. City and County of Honolulu,* 511 F.3d 901, 907 (9th Cir. 2007). In *Long*, the mother of a suspect shot and killed by the police brought claims against the city, county and police alleging the use of excessive force. (*Id*. at 904). The Ninth Circuit found that the police officer acted reasonably when he shot and killed the suspect, and therefore did not violate the decedent's Fourth Amendment rights. (*Id*. at 907). The plaintiff alleged that the city failed to properly train its officers regarding the use of deadly force, but the Ninth Circuit held that, "[i]f no

constitutional violation occurred, the municipality cannot be held liable and whether 'the departmental regulations might have authorized the [alleged violations] is quite beside the point." *Id*. (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). While the liability of cities and counties under § 1983 does not turn on the liability of individual police officers, such liability is necessarily contingent on plaintiff proving that a violation of a federally protected right has occurred. *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994).

For the reasons argued above, Defendants did not violate either the Constitution, the ADA or the RA. Because Plaintiffs have not suffered any violation of any federally protected right, Plaintiffs have no *Monell* claim. *City of Los Angeles v. Heller, supra.*

As a result, the Court should dismiss Plaintiffs' Third Claim for Relief as well. Fed. R. Civ. P. 56(a).

2. Even if an Underlying Violation Could be Identified Plaintiffs Cannot Prove the Defendants Failed to Train Their Employees.

A local government's failure to train its employees "may serve as the basis for [§] 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." *City of Canton*, 489 U.S. 378, 388 (1989); *see also Connick v. Thompson*, 563 U.S. 51, 61 (2011). In order to survive summary judgment, Plaintiff must establish: (1) a violation of a federally protected right; (2) a municipal training program that amounts to deliberate indifference to those federally protected rights; and (3) that a plaintiff's injury would not have resulted if the municipality or county had properly trained its employees. *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153-54 (9th Cir. 2021). A "failure to train" claim rests on showing that the plaintiff's injury "in particular was the obvious result of the allegedly inadequate training" and that the failure to train amounted to 'deliberate indifference'" to the rights of the plaintiff. *Puente v. City of Phoenix*, 123 F.4th 1035, 1067 (9th Cir. 2024) (emphasis in original).

"Deliberate indifference" requires proof that city or county disregarded a known or obvious consequence of its action. *Connick*, 563 U.S. at 61. ("[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989) (deliberate choice to follow a course of action must be made from among various alternatives by city policymakers and that choice must be constitutionally deficient). Further, without notice that a course of training is deficient in a particular respect, final decision makers cannot be said to have deliberately chosen a training program that will cause a violation of constitutional or other federally protected rights. *Taylor v. City & Cnty. Of Honolulu,* No. CV 22-00013 HG-KJM, 2023 WL 2753162, at *14 (D. Haw. Mar. 31, 2023) (citing *Connick*, 563 U.S. at 71-72). In other words, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62.

In the present case, there is no evidence of any such pattern. Moreover, with respect to its policies and practices, as noted above, Linn County has Mobile Crisis Intervention Services ("MCIS"), and its Mobile Crisis Intervention Team ("MCIT") has members who will respond to persons experiencing a mental or behavioral health crisis to employ effective communication and de-escalation techniques with the person in crisis. (McIntyre Decl., ¶ 7). LCSO deputies have access to the MCIT. (Smith Decl., ¶ 6). The City of Albany has an Intergovernmental Agreement with Linn County to access services of the MCIT. (Harnden Decl., ¶ 7; ¶ 8, Ex. 1).

In addition, APD officers have access to a Mental Health Intervention Specialist ("MHIS") pursuant to APD policy no. 671. (Harnden Decl., ¶ 6; Exs. 2-3). The purpose of the MHIS is to give APD officers access to a mental health professional who can intervene and assist in

connecting individuals experiencing mental, emotional, or behavioral issues and/or who are suffering addiction disorders to the appropriate resources. *Id.* In addition, both the LCSO and the APD have deputies and officers who are members of the Linn-Benton County Regional SWAT team, which includes a group of crisis negotiators. (Smith Decl., ¶ 5; Harnden Decl., ¶ 5). The SWAT team's crisis negotiators have received enhanced training on communicating and de-escalation for calls involving persons in crisis or calls for critical incidents, such as hostage situations. *Id*. Both LCSO deputies and APD officers can request a SWAT team negotiator to respond and assist with a call involving a person in crisis. *Id.*

With respect to training, all LCSO deputies and APD officers have attended and graduated from the DPSST academy or its equivalency program for out of state police officer lateral transfers. (Smith Decl., ¶ 3; Harnden Decl., ¶ 3). Crisis intervention training ("CIT") is part of the curriculum given to attendees DPSST police certification training. (Smith Decl., ¶ 4). LCSO requires all LCSO police certified deputies to complete all DPSST required maintenance training, which includes three hours of CIT. *Id.* The coursework covers communication and de-escalation techniques for responding to persons experiencing mental health, emotional or behavioral health crises, including calls involving suicidal subjects. *Id.* In addition to the required CIT course, many deputies attend additional training courses related to responding to persons in crisis. *Id*. These trainings may involve classroom or video presentations, scenario-based exercises, evaluation, feedback and critique. *Id*.

APD has similar training standards related to CIT for its officers. All APD officers are graduates of the DPSST academy. (Harnden Decl., ¶ 3). In addition, since 2021, APD is requiring its sworn and non-sworn officers to attend a 40-hour CIT course as staffing resources allow. (Harnden Decl., ¶ 4). The CIT training course covers communication and de-escalation techniques for responding to persons experiencing mental health, emotional or behavioral health crises,

including calls involving suicidal subjects. *Id*. In addition to the required CIT course, APD officers receive other periodic trainings related to responding to persons in crisis to include de-escalation techniques. The trainings involve classroom or video presentations, scenario-based exercises, evaluation, feedback and critique. *Id*.

Deputy Breshears and APD officers Emile, Fandrem, Tress and APD Lt. Vaughn all graduated from DPSST or its equivalency program for out of state police officer transfers, and all have received trainings related to responding to persons experiencing mental, emotional or behavioral health crises, including communication and de-escalation techniques. (See Breshears Decl., ¶ 4, Ex. 1; Emile Decl., ¶ 4, Ex. 1; Fandrem Decl., ¶ 4, Ex. 1; Tress Decl., ¶ 4, Ex. 1; Vaughn Decl., ¶ 4, Ex. 1).

In addition, some of Defendants' employees are members of the Linn-Benton County Regional SWAT team, which includes a group of crisis negotiators. (Smith Decl., ¶ 5; Harnden Decl., ¶ 5). The SWAT team's crisis negotiators have received enhanced training on communicating and de-escalation for calls involving persons in crisis or for calls involving critical incidents, such as hostage situations. *Id.*

In fact, deputies and officers on scene with Mr. Hamilton and his family members on February 8, 2023, had LCSO Jordan Kirksey and APD Det. Lowery responding to the scene to utilize their additional training and experience to assist with communicating with Mr. Hamilton and his family. (Vaughn Decl., ¶ 8; Tress Decl., ¶ 8.; Kirksey Decl., ¶ 9). Both Deputy Kirksey and Det. Lowery have had extensive training in communication, de-escalation and negotiation for responding to calls for service related to persons experiencing mental health crises and emotional crises, as well as persons under the influence of substances. (See Kirksey Decl., ¶¶ 3-6; Lowery Decl., ¶¶ 1-4). At the time of the incident, Deputy Kirksey had attended a 40-hour course at the Federal Bureau of Investigation's negotiator school, as well as having approximately 32 hours of

training on communication, rapport building and de-escalation with the Western States Hostage Negotiation Association. (Kirksey Decl., ¶ 4). Deputy Kirksey had been part of LCSO's Crisis Negotiation Team ("CNT") since 2021. *Id.* In September, 2019, Det. Lowery had been selected to represent APD as a crisis negotiator for the SWAT team. (Lowery Decl., ¶ 3). As a crisis negotiator, she would respond to assist with any situation in which establishing communication and building rapport for the purpose of influencing behavior and obtaining a subject's physical cooperation was important for a successful and ideally peaceful resolution. *Id.* Both Deputy Kirksey and Det. Lowery responded to the request from their colleagues for enhanced crisis intervention assistance with Mr. Hamilton and his family members. (See Kirksey Decl., ¶¶ 8-11; Lowery Decl., ¶¶ 5-6). Unfortunately, they were unable to arrive on scene before Mr. Hamilton raised the pistol and pointed it at Officers. (Kirksey Decl., ¶ 10; Lowery Decl., ¶ 6).

Plaintiffs cannot prove deliberate indifference.

Accordingly, even if an underlying constitutional violation could be identified anywhere, Plaintiffs' *Monell* claim would still be subject to dismissal. Fed. R. Civ. P. 56(a).

**I. Rickey Allen Hamilton**

As part of the LR 7-1(a) conferral, Plaintiffs' counsel has agreed to dismiss Rickey Hamilton as an individual plaintiff in this action. (Manlove Decl., ¶ 14).

**J. Julius Hamilton, Crystal Priddy and Yolanda Priddy Are Not Parties to Plaintiffs' Action. As such, They Are Not Entitled to Any Form of Damages.**

As part of the LR 7-1(a) conferral, Plaintiffs' counsel has agreed to dismiss any theory of damages for Julius Hamilton, Crystal Priddy and Yolanda Priddy in their individual capacities. (Manlove Decl., ¶ 14).

//

//

//

**K. Plaintiffs Have No Claim for Injunctive Relief or Declaratory Relief.**

Plaintiffs cannot prove any actual success on the merits of their claims. Therefore, they are not entitled to any injunctive or declaratory relief. *eBay Inc. v. MercExchange*, 547 U.S. 388, 391 (2006).

**CONCLUSION**

For all of the above reasons, Defendants respectfully request an Order granting Summary Judgment in their favor. Fed. R. Civ. P. 56(a).

DATED this 17th day of July, 2026.

s/ William W. Manlove
Aaron P. Hisel, OSB #161265
William W. Manlove, OSB #896107
Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing DEFENDANTS' MOTION FOR SUMMARY JUDGMENT on:

George McCoy
Nicole Lemieux
Warren Allen LLP
9600 NE Cascades Parkway Suite 300
Portland, OR 97220
Attorneys for Plaintiffs

by the following indicated method or methods:

☒ by **electronic means through the Court's Case Management/Electronic Case File system** on the date set forth below;

by **emailing** a copy thereof to each attorney at each attorney's last-known email address on the date set forth below;

by **mailing** a full, true, and correct copy thereof in a sealed, first-class postage-prepaid envelope, addressed to plaintiff's last-known address listed above and depositing it in the U.S. mail at Salem, Oregon on the date set forth below.

DATED this 17th day of July, 2026.

s/ William W. Manlove
Aaron P. Hisel, OSB #161265
William W. Manlove, OSB #896107
Attorneys for Defendants